# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

DOMINIQUE A. MORROW,         )     CASE NO. 5:13CV1272
                            )
                            )
         PLAINTIFF,     )     JUDGE SARA LIOI
                            )
vs.                         )
                            )     **MEMORANDUM OPINION**
MAGISTRATE TRACY D. STONER, et   )     **AND ORDER**
al.,                       )
                            )
         DEFENDANTS.    )

Before the Court are three fully-briefed motions to dismiss filed by the various defendants. (Doc. Nos. 15, 16, 17.) For the reasons discussed below, the motions are granted as to the sole federal claim in the first cause of action set out in the first amended complaint; the motions are denied without prejudice as to the two state claims set out in the second and third causes of action. The Court declines supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3), and dismisses the second and third causes of action without prejudice.

## I. PROCEDURAL BACKGROUND

On June 7, 2013, plaintiff Dominique A. Morrow ("plaintiff" or "Morrow"), represented by counsel, filed a complaint for damages against defendants Magistrate Tracy D. Stoner ("Stoner"), Bailiff Steve Norman ("Norman"), Judge Carol J. Dezso ("Dezso"), Judge John P. Quinn ("Quinn"), Sheriff Steve Barry ("Barry"), former Sheriff Drew Alexander ("Alexander"), Deputy Sheriff Kelly Kuhn ("Kuhn"), John and/or Jane Doe Sheriff Officers #1-5

("Doe Officers"),[1] John and/or Jane Doe Sheriff Policy Makers #6-10 ("Doe Policy Makers"), and Summit County.[2] (Doc. No. 1.)

On September 16, 2013, three motions to dismiss were filed: Doc. No. 6 by Stoner and Norman; Doc. No. 7 by Dezso and Quinn; and Doc. No. 8 by Barry, Alexander, Kuhn, Summit County, and all the Doe defendants.

On October 7, 2013, plaintiff filed her first amended complaint. (Doc. No. 9.) On October 16, 2013, plaintiff filed responses to each of the motions to dismiss. (Doc. Nos. 11, 13, and 12, respectively.)

On October 21, 2013, the defendants filed the instant motions to dismiss the first amended complaint. (Doc. No. 15 [Dezso and Quinn]; Doc. No. 16 [Stoner and Norman]; and Doc. No. 17 [Barry, Alexander, Kuhn, Summit County, and the Doe defendants].)[3] Plaintiff filed responses (Doc. Nos. 20, 18, 19, respectively),[4] and defendants filed replies (Doc. Nos. 21, 23, and 22, respectively).

## II. FACTUAL ALLEGATIONS

The following factual allegations, gleaned from Morrow's three-count first amended complaint ("Compl."), are taken as true for purposes of the motions to dismiss.

Morrow alleges that, on January 16, 2013, she filed in the Domestic Relations Division of the Summit County Court of Common Pleas a *pro se* petition for a civil protection

---

[1] Stoner, Norman, Dezso, and Quinn were each sued solely in their individual capacities. Barry, Alexander, Kuhn, and the Doe Officers were all sued both individually and in their official capacities.

[2] Plaintiff also sought and was granted leave to proceed *in forma pauperis* under 28 U.S.C. § 1915(a)(1). (Doc. Nos. 2, 3.)

[3] Although Doc. Nos. 6, 7, and 8 show as pending on the docket, they are superseded by Doc. Nos. 15, 16, and 17, and need not be separately addressed. The Clerk is directed to terminate Doc. Nos. 6, 7, and 8 for record purposes.

[4] Each of these responses incorporated the arguments of plaintiff's original responses: Doc. No. 20 incorporated Doc. No. 13, Doc. No. 18 incorporated Doc. No. 11, and Doc. No. 19 incorporated Doc. No. 12.

order against Rashad Greene. The case was assigned to defendants Dezso and Stoner.[5] (Compl. ¶ 14.) In that petition, Morrow alleged that Greene was violent toward her and threatened to cause her serious physical harm. (*Id.* ¶ 15.) Stoner initially denied an *ex parte* civil protection order and ordered a full evidentiary hearing for January 25, 2013. (*Id.* ¶ 16.)

On January 25, 2013, both Morrow and Greene appeared for the hearing, Morrow accompanied by her cousin and Greene accompanied by his grandmother. All four were initially in the waiting area being "watched by" Norman,[6] who utilized a computer screen to monitor "the images being captured live by various cameras in the courthouse, including the camera inside Defendant Stoner's courtroom." (*Id.* ¶¶ 17-18.)

Morrow and Greene were summoned into the courtroom by Stoner, while Morrow's cousin and Greene's grandmother remained in the waiting area.[7] The litigants were seated across a table from each other, positioned perpendicular to Stoner, who was on the bench. There were audio recorders throughout the closed-door courtroom. (*Id.* ¶ 19.)

The hearing began with Stoner unsuccessfully attempting to "broker a consent agreement between [Morrow] and Greene[.]" (*Id.* ¶ 20.) The hearing proceeded, "with sworn oral

---

[5] Dezso is alleged to be "a duly elected judge in the Summit County Court of Common Pleas, Division of Domestic Relations[,]" who was allegedly "responsible for establishing policies and procedures to ensure that parties, witnesses, and other patrons of the court are protected from foreseeable harm as well as hiring, employing, and supervising Defendants Stoner and Norman." (Compl. ¶ 4.) Stoner is alleged to be "employed as a magistrate" in the same court and division. (*Id.* ¶ 2.) Stoner's role as magistrate allegedly "regularly involves conducting and presiding over hearings with sworn testimony in domestic relations cases, including domestic violence cases such as civil protection orders." (*Id.*)

[6] Norman is alleged to be "employed as the Security Bailiff by the Summit County Court of Common Pleas, Division of Domestic Relations[,]" whose "role as Security Bailiff involves maintaining security of the Domestic Relations Court and ensuring that parties, witnesses, and other patrons of the court are protected from foreseeable harm." (Compl. ¶ 3.)

[7] Morrow alleges that she, Greene, and Stoner were the only people in the courtroom, suggesting that there were no officers or security personnel of any kind present. (Compl. ¶ 19.)

testimony asserting Greene's violent acts and threats of serious physical harm toward [Morrow]." (*Id.* ¶ 21.) Throughout, "Greene visibly displayed agitation and anger[.]" (*Id.*)

During the hearing, when it became known that Greene had outstanding arrest warrants, Stoner made a telephone call, on speaker phone, to verify the warrants. (*Id.* ¶ 22.) Stoner then walked out of the courtroom, closing the door behind her, leaving Morrow and Greene alone. (*Id.*)

Plaintiff alleges that she "immediately became scared, but was so stunned by Defendant Stoner's actions that she was unable to utter any words." (*Id.* ¶ 23.) She claims that because she "was summoned to be in the room by Defendant Stoner, a court official, [she] did not reasonably feel free to leave." (*Id.*)

As Morrow and Greene sat unattended in the courtroom, Greene "became increasingly and uncontrollably agitated and upset toward [Morrow]." (*Id.*) Morrow "tr[ied] to keep calm, [and] hoped that either Defendant Stoner or armed security personnel would step into the room very soon." (*Id.*)

Meanwhile, Stoner "was in the lobby/waiting area speaking with Defendant Norman about arranging a police cruiser to pick up Greene on the outstanding arrest warrants." (*Id.* ¶ 24.) Stoner advised Greene's grandmother to "gather[ ] Greene's personal belongings in advance of him being arrested so that the belongings were not confiscated at the jail." (*Id.*) Greene's grandmother "walked into the courtroom to retrieve his personal belongings." (*Id.*)

"As Greene and [Morrow] sat across from each other, Greene started yelling at [Morrow] in frustration, swinging his arms and fists, and pounding the table." (*Id.* ¶ 25.) Plaintiff "tried to keep still and calm" and "was too scared to move[,]" fearing "any movement might prompt a violent reaction from Greene." (*Id.*) "Suddenly, Greene burst out of his chair and

4

started running around the table to attack [Morrow]." (*Id.* ¶ 26.) Plaintiff ran away, but stumbled and fell. Greene "tackled her, slamming her head and body to the ground into a potted plant by the swinging door leading to the magistrate's bench. Greene then relentlessly and repeatedly struck Plaintiff on her head and body with his fists and the metal bottom of the plant pot." (*Id.*)

While this was occurring, Stoner re-entered the room and "watched as Greene tackled Plaintiff[.]" (*Id.* ¶ 27.) Kuhn "entered the room at a leisurely pace with a stun gun in his hand[,]"[8] which was fired at Greene, "jolting him with enough electrical shock to subdue him, stopping his attack on Plaintiff." (*Id.*)

Morrow alleges to have suffered injuries, both immediate and continuing, from this encounter with Greene, including a lump on her forehead, a bruise on her arm, persistent headaches, and mental and emotional distress. These injuries prohibited her from working, and her absence from work allegedly caused her to lose her job. As of the filing of the complaint, she has been unsuccessful in securing new employment. (*Id.* ¶¶ 30-33.)

## III. DISCUSSION

### A.   Plaintiff's Claims

The complaint contains one federal cause of action and two state causes of action. First, Morrow makes a claim, under 42 U.S.C. § 1983, that "[e]ach Defendant, under the color of law, deprived Plaintiff of her rights and privileges under the due process clause of the Fourteenth Amendment of the United States Constitution to be safe and protected from reasonably foreseeable, excessive, and substantial risks of harm." (Compl. ¶ 64.) She asserts that "[e]ach Defendant knew that security measures had to be designed, implemented, and executed to

---

[8] Plaintiff is mistaken in her allegation that Kuhn was the responding officer. Kelly Kuhn is a female officer who took the post-incident report; the responding officer was male. (Doc. No. 17 at 193.) This apparent error in the pleading has no bearing on the Court's resolution of the pending dispositive motions.

effectively curtail" the "reasonably foreseeable, excessive, and substantial risk of harm to a party's health and safety inside the courthouse when the party is there for a civil protection order case alleging domestic violence and threats of serious physical harm." (*Id.* ¶ 65.) She alleges that, when Stoner "left Plaintiff all alone with Greene in the courtroom, she created an imminent danger for Plaintiff to be physically harmed by Greene[ ] . . . [and] acted recklessly and with deliberate indifference to Plaintiff's health and safety[,]" actions that "shock the conscience and directly and proximately caused Plaintiff's injuries and damages." (*Id.* ¶ 66.) She alleges that Dezso and Quinn were both "in charge of supervising" defendants Stoner and Norman, that they knew that Stoner and Norman were "inadequate" in keeping the courtroom safe, but that they "condoned" the violation of Morrow's rights, proximately causing her injuries and damages. (*Id.* ¶¶ 67, 68.) She alleges that Barry, Alexander, and the Doe Policy Makers "failed to establish sufficient policies and procedures to keep the courtroom secure[,]" "failed to train and supervise" Kuhn and the Doe Officers, and "failed to obtain the necessary funding and resources to ensure the security of the courthouse[,]" in "reckless and deliberate[] indifferen[ce] to Plaintiff's health and safety[,]" and proximately causing plaintiff's injuries and damages. (*Id.* ¶ 69.) Finally, she alleges that Kuhn and the Doe Officers "failed to act swiftly enough to stop Greene from physically and mercilessly beating Plaintiff before she suffered head injuries[,]" all in "reckless and deliberate[ ] indifferen[ce] to [her] health and safety[,]" and proximately causing her injuries and damages. (*Id.* ¶ 70.)

Morrow's second claim is for false imprisonment and is levied only against Stoner. She alleges that, when Stoner "left the room and closed the door, she intentionally left Plaintiff, without her consent, in a limited space with Greene, a man Stoner knew was a violent threat toward Plaintiff." (*Id.* ¶ 71.) She asserts that, because she "did not reasonably feel free to

leave, she was confined." (*Id.*) The confinement allegedly was a direct and proximate cause of her injuries and damages. (*Id.*)

Finally, plaintiff's third claim is for negligence. She alleges that Stoner, Norman, Kuhn, and the Doe Officers "all owed a duty of care to Plaintiff to ensure her safety in the courthouse as party to an official court proceeding." (*Id.* ¶ 72.) "Because the nature of the court proceeding involved domestic violence and a civil protection order, their duty of care was higher than that of typical court proceedings." (*Id.*) Because "[i]t was foreseeable that violence could erupt" they "breached their duty of care to Plaintiff[,]" proximately causing her injuries and damages. (*Id.*) Morrow alleges that Barry, Alexander, and the Doe Policy Makers "each owed a duty of care to Plaintiff to adequately hire, train, and supervise their deputies." (*Id.* ¶ 73.) These defendants allegedly "breached this duty in their negligent hiring, training, and supervision of Defendant Kuhn by failing to ensure that Defendant Kuhn was properly qualified and trained to be a deputy sheriff[.]" (*Id.*) Such breach allegedly directly and proximately caused plaintiff's injuries and damages. (*Id.*) Finally, plaintiff alleges that defendants Dezso and Quinn "each owed a duty of care to Plaintiff to adequately hire, train, and supervise their magistrates and security bailiff." (*Id.* ¶ 74.) She alleges they "breached this duty in their negligent hiring, training, and supervision of Defendants Stoner and Norman by failing to ensure that [they] were properly qualified and trained in their positions and competently performing their required job duties." (*Id.*)

## B.      Standard on a Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right

7

to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing authorities). In other words, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id*. at 556, n.3 (criticizing the *Twombly* dissent's assertion that the pleading standard of Rule 8 "does not require, or even invite, the pleading of facts").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 678-79. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. "The court need not, however, accept unwarranted factual inferences." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

## C.    Analysis

### 1.    The Federal Section 1983 Claim

#### a.    The Merits of the Section 1983 Claim

The only federal claim in the complaint is brought under 42 U.S.C. § 1983. "Section 1983 provides a federal cause of action against state officials for the deprivation of constitutional rights under color of state law." *Pierce v. Springfield Twp., Ohio*, No. 13-3720, 2014 WL 1408885, at *3 (6th Cir. April 11, 2014).

Plaintiff alleges that defendants, in various ways, failed to protect her from the reasonably foreseeable danger posed by Greene while she was in the courthouse seeking a civil protection order against him, a failure she claims was a violation of her due process rights under the Fourteenth Amendment.

The Court's analysis begins with the teachings of *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989), where a county department of social services and several of its social workers took action to protect a child from his abusive father, but did not remove the child from his father's sole custody. Eventually, the child's father beat him so severely that he suffered permanent brain damage and was expected to spend the remainder of his life in an institution. The child's mother sued under § 1983 asserting that the state, by failing to appropriately intervene to protect the child from his father, had deprived the child of his liberty interest in bodily integrity, in violation of the Fourteenth Amendment Due Process Clause.

The Supreme Court determined that the claim "is one invoking the substantive rather than the procedural component of the Due Process Clause[.]" *Id.* at 195 (petitioners claimed that the State "was categorically obligated to protect [the minor] in these circumstances[]"). "But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.*[9] "The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* "[A] State's failure to protect an individual

---

[9] By alleging that she lost her job due to her injuries and has been unable to secure new employment (Compl. ¶¶ 31, 33), Morrow seems to be trying to bolster her due process claim to include not only some form of a liberty interest, but also a property interest. Neither interest exists under these facts.

against private violence simply does not constitute a violation of the Due Process Clause." *Id*. at 197.

Despite articulating this general rule, the Court in *DeShaney* provided for an exception. It "stated that the Due Process Clause imposed an affirmative duty to protect an individual against private acts of violence where a 'special relationship' exists between the state and the private individual, such as when the state takes a person into its custody." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (citing *DeShaney*, 489 U.S. at 199-201). But the Court "left open the possibility that the state may be liable for private acts which violate constitutionally protected rights despite the absence of a special relationship[,] . . . stat[ing] that, '[w]hile the State may have been aware of the dangers that [the child] faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them*.'" *Id.* (quoting *DeShaney*, 489 U.S. at 201) (emphasis added by *Kallstrom*). Joining other circuit courts of appeals, the Sixth Circuit in *Kallstrom* thereby recognized the so-called "state-created-danger theory of liability," under which liability "is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Id.* (citing cases). The court noted that "the state's actions [must] place the victim specifically at risk, as distinguished from a risk that affects the public at large." *Id.* (citing cases).

Each of the three motions to dismiss argues, in reliance upon *DeShaney*, that, as a general rule, no defendant had a constitutional duty to protect Morrow from Greene, a private, third-party actor. Defendants further argue that the recognized exceptions to this general rule do not apply in the circumstances of this case; in particular, they argue that they had no special relationship with Morrow because she was not in their custody, and that they did not create or

increase any risk to Morrow. (Doc. No. 15 at 163-66;[10] Doc. No. 16 at 177-83; Doc. No. 17 at 197-202.)

There can be no doubt that, unless an exception applies, none of the defendants had a constitutional duty to protect Morrow from Greene's private actions. Plaintiff's complaint does not explicitly allege either a "special relationship" theory or a "state-created-danger" theory of liability with respect to any of the defendants. Reading the complaint *very* liberally, the Court might find *suggestions* of both theories, as against Stoner only, in Morrow's allegations that, when defendant Stoner, despite her knowledge of detailed claims of Greene's violence toward plaintiff, left plaintiff all alone with Greene in the courtroom, Morrow "did not reasonably feel free to leave[,]" (suggesting she felt she was "in custody"—a special relationship—a fact further supported by the allegation of false imprisonment), and Stoner thereby "heightened the risk that Greene would seriously harm Plaintiff[,]" and "created an imminent danger for Plaintiff to be physically harmed by Greene[,]" (suggesting Stoner "created" or "increased" the special danger to plaintiff). (Compl. ¶¶ 23, 43, 45, 66.)

Plaintiff's assertion that she did not feel free to leave the room, taken as true for purposes of these motions, is insufficient to establish that she was "in custody" or had any sort of "special relationship" with any of the defendants. Plaintiff voluntarily came to the courthouse to conduct her business, and the mere fact that she was left in a room with a closed door does not equate to "custody." *See, e.g., Zelig v. Cnty. of Los Angeles*, 45 P.3d 1171, 1195-96 (Cal. 2002)

---

[10] Defendants Dezso and Quinn make this argument only in the alternative, as it is their primary argument that they are simply not proper parties to this lawsuit. They assert that, as judges serving on the court of common pleas: (1) they have no authority or duty with respect to maintaining courthouse security, since that duty falls entirely within the province of the county commissioners; (2) they have no duty to train personnel with respect to safety and security in the courthouse; and (3) neither their alleged control over the courthouse budget nor their hiring authority creates any such duty. (Doc. No. 15 at 156-58.) The Court finds this argument persuasive as ground for dismissal of the action against Dezso and Quinn, although the argument discussed in the body of this opinion is equally persuasive and applicable.

("Plaintiffs offer no relevant authority for the proposition that all litigants who must be present in the courthouse to pursue their litigation should be considered to be in de facto custody or to be the beneficiaries of a special relationship entitling them to enhanced protection against third party crime[.]").[11]  "[T]he custody exception applies in situations where 'the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety.'" *Cutlip v. City of Toledo*, 488 F. App'x 107, 113 (6th Cir. 2012) (quoting *DeShaney*, 489 U.S. at 199-200). Accordingly, all defendants are entitled to dismissal to the extent the complaint might be read to assert a "special relationship" or "custody" theory of liability.

As for the possible "state-created-danger" theory, to prevail on such a claim plaintiff must establish:

> (1) an affirmative act by the State that either created or increased the risk that the plaintiff would be exposed to private acts of violence; (2) a special danger to the plaintiff created by state action, as distinguished from a risk that affects the public at large; and (3) the requisite state culpability to establish a substantive due process violation.

*Jasinski v. Tyler*, 729 F.3d 531, 539 (6th Cir. 2013) (quoting *Schroder v. City of Fort Thomas*, 412 F.3d 724, 728 (6th Cir. 2005)).

Even read in light of the somewhat liberal standards for a motion to dismiss, plaintiff's allegations with respect to defendant Stoner are insufficient to state a § 1983 claim

---

[11] In *Zelig*, guardians of the minor children of a woman who was shot to death by her former husband while the two were in a courthouse attending a hearing on spousal and child support brought an action against the county and the sheriff's department asserting a § 1983 claim and various tort claims. The California Supreme Court concluded that defendants' failure to protect the woman from private violence by her ex-husband was not a due process violation giving rise to a § 1983 claim. *Id.* at 1197.

under a "state-created-danger" theory.[12] In particular, the complaint fails to allege an affirmative

act by Stoner that created or increased the risk to plaintiff. The Sixth Circuit has stated that, "[i]n

determining whether an affirmative state act increased the risk of harm to an individual, the

question is whether the individual 'was safer *before* the state action than . . . *after* it.'" *Jasinski v.*

*Tyler*, 729 F.3d 531, 539 (6th Cir. 2013) (quoting *Cartwright v. City of Marine City*, 336 F.3d

487, 493 (6th Cir. 2003) (emphasis in original)). Whether or not Stoner left the courtroom during

the hearing (the sole allegation that *arguably* supports this theory), Morrow was already at risk

due to Greene's alleged violent propensity toward her. By her own admission, "[a]ll throughout

the proceeding, Greene visibly displayed agitation and anger regarding Plaintiff's attempt to

obtain a civil protection order against him." (Compl. ¶ 21.) Stoner's action did not place Morrow

in any worse position. *See DeShaney*, 489 U.S. at 201 ("That the State once took temporary

custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it

placed him in no worse position than that in which he would have been in had it not acted at

all[.]").

        But plaintiff argues in opposition to the motions that, to get a civil protection

order against Greene, she was required to go to court and use the services of the judicial branch.

---

[12] In the Sixth Circuit, a mere failure to act provides no basis for state-created-danger liability; there must be an affirmative act. *Koulta v. Merciez*, 477 F.3d 442, 445-46 (6th Cir. 2007). Here, the allegations against all but Stoner amount to allegations of failure to act—e.g., Norman "failed to attend widely available classes that would have sufficiently trained him how to keep a courthouse safe and secure[ ]" and "did not intervene to stop the altercation, despite being in a position to do so" (Compl. ¶¶ 46, 48); Dezso and Quinn "failed to sufficiently address" deficiencies in Norman's training and competencies (*id.* ¶ 49); Barry, Alexander and the Doe Policy Makers "failed to sufficiently train" Kuhn and the Doe Officers, "failed to hire and train a sufficient number of deputies to keep [the courthouse] secure[,]" and "failed to obtain and allocate the necessary funds to hire and train a sufficient number of deputies[ ]" (*id.* ¶¶ 50, 51, 52); Kuhn and the Doe Officers "failed to attend widely available classes that would have sufficiently trained them how to keep a courthouse safe and secure[,]" failed to "engage all necessary measures" to keep the courthouse safe, and Kuhn, in particular, failed to react quickly enough to the altercation in the courtroom (*id.* ¶¶ 56, 57, 58); and, Summit County "failed to provide . . . the necessary funding to adequately secure the courthouse . . ." thereby "increas[ing] the risk of courthouse patrons being harmed by other patrons who see the lack of security as an opportunity to commit violence[ ]" (*id.* ¶ 53).

Therefore, she claims that a "constitutional right to safety flows down [from the state actors] to the parties who directly depend on the court to provide justice." (Doc. No. 11 at 133, incorporated by reference into Doc. Nos. 12 and 13.) Plaintiff cites no authority for this assertion and the Court's independent research has found none. In fact, *Zelig*, *supra*, stands for the opposite proposition. Plaintiff's attempt to thus "spin" the allegations of the complaint to salvage the § 1983 claim is to no avail. Dismissal of the § 1983 claim against all defendants, including Stoner, is warranted.

Finally, the Court also notes briefly that Summit County cannot be held liable for the actions of others on any theory of *respondeat superior*. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). As a local government entity, it is liable only for injuries resulting from official policies and customs. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). The complaint identifies no policy or custom of the county that was the "moving force" behind any alleged constitutional violation. *See Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).

Due to these conclusions regarding the merits of the § 1983 claim, the Court finds no need to address all of the other arguments raised by defendants in the three motions. That said, the Court will briefly address the issue of immunity.

### b.    Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Because it is "a broad grant of protection, and is 'an *immunity from suit* rather than a mere defense to liability[,]"

*Sheffey v. City of Covington*, No. 12-5109, 2014 WL 1663063, at \*4 (6th Cir. Apr. 28, 2014) (quoting *Scott v. Harris*, 550 U.S. 372, 376 n. 2, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (emphasis in original)), "[o]nce a defendant raises qualified immunity, 'the burden is on the plaintiff to demonstrate that the official[ is] not entitled to qualified immunity,' by alleging 'facts sufficient to indicate that the [government official's] act in question violated clearly established law at the time the act was committed[.]'" *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 444 (6th Cir. 2012) (alterations in original) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) and *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992), respectively.)

In opposition to defendants' assertions of qualified immunity, Morrow argues that "litigants have a constitutional right to be reasonably free from harm in a courtroom[.]" (Doc. No. 11 at 139.) She argues, with respect to Stoner, that "[a] reasonable person would have known not to leave a vulnerable person alone in a closed small room with the person she alleges is threatening her, especially after testimony and evidence of such threats were presented." (Doc. No. 11 at 139.)

To fall outside the protection of qualified immunity, defendants' discretionary acts would have to have been in violation of a *clearly established* right. Plaintiff cannot meet her burden of demonstrating such a right, and actually makes virtually no attempt to do so. She merely argues that even if the alleged right is not clearly established, "such lack of clarity should not serve to insulate" defendants. (Doc. No. 11 at 139; Doc. No. 13 at 148.) But that is *precisely* the purpose of qualified immunity—to protect state actors from liability for acts that were not clearly established as constitutional violations at the time they were performed.

Thus, even if there were merit to plaintiff's § 1983 claim, the individual defendants would be entitled to qualified immunity.

2.      **The Two State Law Claims**

Having determined that the sole federal claim should be dismissed as to all of the defendants, the Court is left to consider the two state law claims. A district court "may decline to exercise supplemental jurisdiction over a claim" if the court "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). The decision requires considerations of "judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claim[.]" *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996).

Due to the filing of the defendants' respective motions to dismiss early in the proceedings, there has been no Case Management Conference, no discovery, and no other proceedings in this case; rather, procedurally, this case is still at an early stage. As such, the Court declines to exercise supplemental jurisdiction over the two state claims, which shall be dismissed without prejudice.

### IV. CONCLUSION

For the reasons set forth herein, defendants' respective motions to dismiss (Doc. Nos. 15, 16 and 17) are **GRANTED in part and DENIED in part**. They are granted as to the sole federal claim in the first cause of action set out in the first amended complaint and denied as to the two state claims set out in the second and third causes of action. The Court declines supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3), and dismisses the second and third causes of action without prejudice.

16

Pursuant to 28 U.S.C. § 1915(a)(3) and Fed. R. App. P. 24(a)(3)(A), the Court certifies that an appeal from this decision could not be taken in good faith because the teachings of the case law set forth herein preclude plaintiff's federal cause of action.

**IT IS SO ORDERED**.

Dated: September 5, 2014

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

17